1

2

3

4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7  GREENSPRINGS BAPTIST CHRISTIAN    )   Case No. 09-1054 SC
   FELLOWSHIP TRUST,                 )
8                                    )
            Plaintiff,               )   ORDER GRANTING
9                                    )   MOTIONS TO STRIKE
        v.                           )
10                                   )
   ROBERT MILLER, an individual;     )
11 BARBARA MILLER, an individual;    )
   ANNE MILLER, an individual; JAMES )
12 P. CILLEY, an individual; MARK A. )
   SCHMUCK, an individual; and       )
13 TEMMERMAN, CILLEY & KOHLMANN, LLP, )
                                     )
14          Defendants.              )
   ──────────────────────────────── )
15

16

17 **I.    INTRODUCTION**

18      This is a suit for malicious prosecution, brought by Plaintiff

19 Greensprings Baptist Christian Fellowship Trust ("Greensprings")

20 against Defendants Robert ("Bob") Miller, Barbara ("Barbara")

21 Miller, and Anne Miller ("Anne," and collectively, "the Millers"),

22 as well as attorneys James Cilley, Mark Schmuck, and their firm,

23 Temmerman, Cilley & Kohlmann, LLP (collectively, "Attorney

24 Defendants," and collectively with the Millers, "Defendants").  See

25 First Am. Compl. ("FAC"), Docket No. 4.  Now before the Court are

26 Defendants' special motions to strike the FAC.  Docket Nos. 28

27 ("Miller Motion"), 38 ("Attorney Motion").  Greensprings has filed

28 an Opposition, Docket No. 46, and Defendants have each filed a

Reply, Docket Nos. 53 ("Attorney Reply"), 54 ("Miller Reply").

Having considered the papers submitted by all parties, the Court

GRANTS the Defendants' motions.

## II.  BACKGROUND

### A.  Turchen and Greensprings

This case is the most recent in a series of suits that can be traced back to Greensprings' connection with two deceased individuals, Elsie Turchen ("Turchen") and her son, Ward Anderson ("Ward").  This relationship is not the focus of the present suit; nevertheless, a short overview is helpful as background.  Ward passed away on July 12, 1998, and Turchen passed away on December 10, 2000.  Glazner Decl. Ex. 1 ¶ 24;[1] Miller Mot. at 3.  Before Turchen passed away, she had deeded a number of properties to Greensprings.  Bohn Decl. ¶ 3.[2]  These properties were managed by Ber Management ("Ber"), which employed Christine Dillon ("Dillon") and Donald Bohn ("Bohn"), who both apparently worked closely with

---

[1] Pamela Glazner, counsel for the Millers in the current litigation, filed a declaration in support of the Miller Motion. Docket No. 33.  The document that the Court here cites is the Second Amended Complaint in a related suit, Anderson v. Dillon, No. CIV 445617 (San Mateo Sup. Ct., filed Mar. 18, 2005).  The Millers request that this document be subject to judicial notice, and both parties have submitted various court documents from other law suits involving parties to this suit, and have requested that this Court take judicial notice of these documents.  Docket Nos. 32, 39, 50, 55.  The Court may take judicial notice of proceedings and filings in other courts.  See United States ex rel. Robinson Racheria Citizens Council v. Borneo, Inc., 971 F.2d 244, 248 (9th Cir. 1992).  The Court hereby GRANTS these requests for judicial notice.

[2] Donald Bohn, whose relationship to the litigation will be discussed in greater detail below, submitted a declaration in support of Greensprings' Opposition.  Docket No. 47

2

the Turchen properties.  Id. ¶¶ 3-4, 11.  This Court has not been presented with evidence that explains why Turchen transferred properties to Greensprings, or what the nature of the personal relationship between Turchen, Dillon and Bohn was.  After Turchen passed away, Dillon was evidently handling properties of the estates, as well as property of Greensprings, although she apparently lacked the proper authority to do so.  Id.  She allegedly held herself out as the representative of Turchen's estate.  Miller Mot. at 3.  The relationship between Greensprings and the estates was the subject of a separate litigation brought by Penny Anderson ("Penny"), who is the daughter of Ward and the granddaughter of Turchen.  See Anderson v. Dillon, No. CIV 445617 (San Mateo Sup. Ct., filed Mar. 18, 2005) (hereinafter "the Anderson suit").  The Anderson suit reached a settlement, and its outcome does not impact the current suit.

### B.   Turchen's Gift to the Millers

Barbara and Bob Miller are the adoptive parents of Molly Miller ("Molly"), who is the biological daughter of Penny and therefore the granddaughter of Ward and great-granddaughter of Turchen.  Barbara Aff. ¶ 1; Bob Aff. ¶ 1.[3]  Barbara and Bob are also the biological parents of Anne Miller.  Barbara Aff. ¶ 1; Bob Aff. ¶ 1.  On November 23, 2000, less than three weeks before Turchen passed away, Turchen wrote a one-page letter to Bob and Barbara.  See Barbara Miller Aff., Ex. 1 ("Turchen Letter").  By this letter, Turchen offered the gift of a house to Anne and Molly:

---

[3] Barbara and Bob both submitted an affidavit in support of the Miller Motion.  Docket Nos. 29, 30.

> I would like to do something for your girls.  I do
> not shop; and I don't want to send things that
> have to be exchanged, or are not useful so I have
> failed to do anything on either Annie's or Molly's
> birthdays.
> Would you consider the gift of a house for them?
> Enclosed is the picture.  It is one in which Bob
> would have its use which includes 3 bedrooms, 2
> baths and one or even 2 offices.  It is well
> located and has been rented, so it requires some
> maintenance, which I would gladly do.  It is free
> and clear.
> It will go vacant approximately 2/1/2001.
> As you know, I am very ill.  However I come to the
> office every day.  When you call me at night, I am
> usually asleep; and it is hard to talk to you.
> I need to know before 2/1/2001 if you are
> interested; and a call in the daytime would be
> appreciated.
> The house is one block off the El Camino on the
> west side, and on a cul-de-sac.  It is 325 Malcom,
> Belmont, Ca.
> I think we could slip this through as an
> inter-family change of vesting, but I will do
> anything you prefer.

Id.

The Millers did not accept this gift before Turchen passed

away.  Barbara Aff. ¶ 4.

### C.    The Alleged Promise Between Dillon and the Millers

In an attempt to reach Turchen, Barbara contacted Bohn and

learned of Turchen's passing.  Id. ¶ 5.  Barbara claims that Bohn

referred her to Dillon, and that Dillon "said that she had been

looking after Elsie and that Elsie turned to Ms. Dillon whenever

she had a problem," and told Barbara that she was aware of the

Turchen Letter.  Id. ¶¶ 5-6.  According to Barbara, Dillon told her

that Turchen "did not own the property listed in the letter because

Ward had put it in a trust, but that she wanted to honor Elsie's

gift to Molly and Anne anyway."  Id. ¶ 6.  According to

Greensprings, Turchen had actually deeded the house to

4

Greensprings.  Opp'n at 1.  Barbara claims that Dillon offered to have the house appraised, so that she could give the Millers the equivalent amount of money, and that Dillon later informed Barbara that the house had been appraised for approximately $500,000. Barbara Aff. ¶¶ 6-7.

Barbara states that she and Bob decided that the money should go to a charity on behalf of Molly and Anne, and they chose the Maui Preparatory Academy ("MPA") because it was planning to buy land near the Millers' home.  Id. ¶ 7.  In 2002, Greensprings did attempt to provide $500,000 to MPA at the Millers' urging, although the parties apparently disagree as to how this contribution was to be characterized.  See Bohn Decl. ¶¶ 6, 10, Exs. A, B.  Bohn states that the gift was to be in honor of Ward and Turchen, and that "there was no request at that time for a gift in the names of Anne and Molly Miller or for a gift in lieu of the house."  Id.  In 2002, Bohn traveled to Maui to look at the proposed development. Id. ¶ 6.  On August 11, 2002, two checks totaling $500,000, signed by Bohn, were issued from "Real Estate Trust" to "First Hawaiian Title Company," and donated by a "Grace Parish Church."[4]  Opp'n at 2-3; Barbara Aff. ¶ 9.  Shortly thereafter, the Millers wrote to Bohn and Dillon, explaining that "First Hawaiian Title Company" did not exist, and asking them to reissue the checks to "First Hawaii Title Corporation" instead.  Opp'n at 3; Barbara Aff. ¶ 10-11. Bohn and Dillon did not reissue the check over the next two years,

---

[4] The Court has not received an explanation as to what Grace Parish Church was, or whether it was an actual entity associated with Greensprings or Ber.

5

and the Millers apparently ceased contact with them in or around
late 2002. See Bohn Decl. Ex. C ("November 14, 2004, Letter").

On November 14, 2004, the Millers sent a letter to Dillon and
Bohn, acknowledging that "it has been close to two years since our
last contact." Id. The letter described how MPA had overcome
certain difficulties in procuring land for the new school, and
explained that MPA was raising money to renovate a building on its
newly-acquired land. Id. As this letter is central to several of
Greensprings' arguments for the present motion, it is worth quoting
at length (note that Turchen is referred to by her nickname,
"Teddy"):

> You left us in quite an embarrassing position
> the last time by first issuing two checks one in
> the amount of $497,000.00 and the other in the
> amount of $3,000.00 neither one of them originating
> from the Grace Parish Church. I can't begin to
> tell you how happy the MPA school board was to
> receive the donation. That was until they realized
> you had issued the checks to a non-existent Title
> Company rendering the checks valueless. The
> embarrassment continued when we hired an attorney
> to work with Grace Parish Church and Mr. John Wyse
> as President of Grace Parish Church on the Land
> Purchases Agreement you sent to MPA. Not only
> could the attorney not find any listing of a Grace
> Parish Church nor could he find it's [sic]
> President, Mr. John Wyse. He informed MPA that
> this was a non-existent entity, the details of
> which were very suspicious to say the least. Such
> behavior would tend to suggest that you have
> something to hide and that more importantly you are
> afraid of any inquiry that might result in
> discovery.
>     As you are well aware, this entire effort on
> our part is an attempt to provide a decent
> education for our daughter and Elsie G. Turchin
> [sic] and Ward D. Anderson's grandchild Molly
> without the added hardship of a three hour a day
> commute on a dangerous road. This is what Teddy
> and Ward would have wanted for Molly and I have the
> documentation to prove it. We can afford to pay
> the tuition but not build the school ourselves. As

Molly's education is dependent on the success of MPA as her only school alternative we will ask both of you again for the last time to issue a check in the amount of $500,000.00 payable to Maui Preparatory Academy c/o Molly Miller. (This time, however, without the embarrassment that went along with your previous attempts at trying to appear as having done something but in reality did not.) This money represents the fair market value (according to the appraisal you told us you had done) of the home at 325 Malcolm, Belmont, Ca. that Teddy was about to give Molly and Annie on her deathbed. This was also the verbal agreement that you had come to with us regarding this matter and that is why you issued the checks for $497,000.00 and $3,000.00 respectively to honor that agreement. You both know that this is the right thing to do but if you should decide not to you will be forcing us to commence an investigation of your handling of Grandma Teddy's estate if for no other reason than to find out the reason for your peculiar behavior and just what it is that you are trying to hide with respect to Grandma Teddy's along with Grandpa Ward's respective estates. This is the last thing that we want to embark on but we believe that we owe it to Grandma to see that her last wish regarding this matter is fulfilled. We look forward to hearing from you. . . .

Id.

On January 10, 2005, Bohn sent the Millers a cashiers check for $500,000, made out to MPA. Barbara Aff. ¶ 12; Opp'n at 3. Barbara did not cash this check because, as she claims, she did not approve of actions taken by MPA's new board president. Barbara Aff. ¶ 12. Barbara apparently decided that she did not want MPA to receive the funds, and on July 22, 2005, Barbara sent a letter to Dillon and Bohn requesting that the cashier's check be reissued to three other academic institutions. Id. ¶ 13; Barbara Aff. Ex. 5. Bohn referred Barbara to attorney Carleton Briggs ("Briggs"), and Barbara repeated her request to him. Barbara Aff. ¶ 13.

On August 11, 2005, Briggs sent Barbara a letter, informing

her of the <u>Anderson</u> suit, and stating that he had been ordered to "assume direct control of all the accounts and to suspend charitable donations or unapproved expenditures while the court examines [the] allegations . . . ." Barbara Aff. Ex. 8.  He stated that the check would be deposited in the Greensprings account, and then reissued after a motion with the court in <u>Anderson</u>, which would be done "with all possible haste . . . ." <u>Id.</u>  According to Briggs' letter, the money would remain in separate, interest-bearing accounts and earmarked for the schools that Barbara had indicated.  <u>Id.</u>  Barbara returned the check.  Barbara Aff. ¶ 15.  However, the money was never submitted to the schools, and was instead paid into Turchen's estate as part of the settlement in the <u>Anderson</u> suit.  Opp'n at 4.  The Millers thereafter filed a suit of their own against Greensprings.  <u>Miller v. Greensprings Baptist Christian Fellowship Trust</u>, No. 07-4776 (N.D. Cal. removed Sept. 17, 2007) ("the <u>Miller</u> suit").[5]

     **D.**   **The Miller Suit**

    In the <u>Miller</u> suit, the Millers alleged that Greensprings had breached a contract with the Millers, unlawfully converted the $500,000 in question, and committed fraud.  Notice of Removal, Ex. A at 5-8, Miller Docket No. 1.  The Millers requested that the $500,000 be paid to them personally (or rather, to Anne and Molly), and also requested punitive damages.  <u>Id.</u> at 9.  The Millers claimed that they had relied upon Dillon and Briggs' assurances, and that based on these assurances they had made no claim against

---

    [5] Court documents in the underlying action are referred to as Miller Docket No. XX.

Turchen's estate and had returned the certified check to
Greensprings.  Id. at 5-6.  Magistrate Judge Larson dismissed the
complaint with leave to amend.  Miller Docket No. 48 ("First
Dismissal Order").  In short, the court explained that the Millers
had failed to make a showing of damages, because the $500,000 in
question was to be donated to charities and thus the Millers had
suffered no loss.  Id. at 4-5.  The Millers had also failed to
explain how Turchen's gift of a house resulted in viable claims
against either Greensprings or Turchen's estate.  Id. at 5.

The Millers amended their complaint, and added Bob as a
plaintiff.  Miller Docket No. 49.  This complaint added several
allegations, including a claim that the Millers had pledged
$200,000 to Seabury Hall in reliance on assurances made by
Greensprings or its associates, and that Seabury Hall had begun to
pursue collection of the pledge.  Id. ¶¶ 45, 57.  The Millers
therefore also requested $200,000 as alternative relief.  Id. at
26.  The Millers also added two novel theories to their complaint
-- intentional and negligent interference with the right to
inherit.  Id. ¶¶ 91-102.

Magistrate Judge Larson dismissed this amended complaint.
Docket No. 98 ("Second Dismissal Order").  The $200,000 pledge had
been promised not by the Millers themselves, but by the Miller
Family Foundation, a separate entity that was not part of the
action and which was in suspended status.  Id. at 7.  As a new
breach-of-contract theory, this claim had also become time-barred.
Id.  As Magistrate Judge Larson noted, the "interference with the
right to inherit" claims are not recognized by existing law.  Id.

9

at 8, 16-17.  The Millers also failed to support any of their prior claims.  The facts surrounding the alleged contract did not support a conclusion that the Millers' claimed reliance was reasonable, and the Millers' could not point to a valid claim that they had waived in reliance upon any of the alleged promises.  Id. at 8-11. Finally, the court noted that a payment of $500,000 by Greensprings would ultimately be an ultra vires act, and could result in the loss of Greensprings' tax exempt status.  Id. at 11-12.

Following the dismissal of the Miller suit, Greensprings brought the present suit against the Millers and Attorney Defendants (who served as the Millers' counsel in the Miller suit), claiming that the Miller suit was an instance of malicious prosecution.  See FAC.  The Defendants have responded by filing special motions to strike under California's anti-SLAPP statute, section 425.16 of the California Code of Civil Procedure ("section 425.16").[6]  See Attorney Mot.; Miller Mot.  These motions are premised on the notion that, by proceeding in the Miller suit, they were essentially participating in a protected activity, i.e., the right to petition.  The Court now evaluates the validity of these claims.

**III.  <u>LEGAL STANDARD</u>**

To determine whether to grant an anti-SLAPP motion brought

---

[6] "SLAPP" stands for "strategic litigation against public participation."

10

under section 425.16, a court must undertake a two-step process.[7]
First, the defendant must show that the cause of action arises from
"any act of that person in furtherance of the person's right of
petition or free speech under the United States or California
Constitution in connection with a public issue . . . ."  Cal. Civ.
Proc. Code § 425.16(b)(1); <u>Kearney v. Foley & Lardner, LLP</u>, 566
F.3d 826, 836 (9th Cir. 2009).  Defendants need only make a prima
facie showing that the activity that forms the basis for the
plaintiff's suit is protected.  <u>See</u> <u>Flatley v. Mauro</u>, 39 Cal. 4th
299, 315-16 (2006).  However, if the challenged activity is illegal
as a matter of law, "where either the defendant concedes the
illegality of its conduct or the illegality is conclusively shown
by the evidence," then the activity is not protected and the motion
must be denied.  <u>Id.</u>

        If the defendant establishes that they have met their burden,
then the burden shifts, and the court "must then determine whether
the plaintiff has demonstrated a probability of prevailing on the
merits." <u>Kearney</u>, 566 F.3d at 836 (citing <u>DuPont Merck Pharm. Co.
v. Super. Ct.</u>, 78 Cal. App. 4th. 562, 567 (Ct. App. 2000)).  The
plaintiff "must demonstrate that the complaint is both legally
sufficient and supported by a sufficient prima facie showing of
facts to sustain a favorable judgment if the evidence submitted by
the plaintiff is credited." <u>Vargas v. City of Salinas</u>, 46 Cal. 4th
1, 19-20 (2009) (quoting <u>Wilson v. Parker, Covert & Chidester</u>, 28

---

        [7] This section may be invoked by defendants in federal court.
<u>See</u> <u>Verizon Del., Inc. v. Covad Communs. Co.</u>, 377 F.3d 1081, 1091
(9th Cir. 2004).

1  Cal. 4th 811, 821 (2000)).  "The plaintiff need only establish that

2  his or her claim has 'minimal merit' to avoid being stricken as a

3  SLAPP."  <u>Soukup v. Law Offices of Herbert Hafif</u>, 39 Cal. 4th 260,

4  291 (2006) (citations omitted).

5      Evidence submitted by both parties may be considered, and

6  although "the court does not weigh the credibility or comparative

7  probative strength of competing evidence, it should grant the

8  motion if, as a matter of law, the defendant's evidence supporting

9  the motion defeats the plaintiff's attempt to establish evidentiary

10 support for the claim."  <u>Id.</u> at 20 (citations omitted).  Evidence

11 must be of the type admissible at trial, and averments made on

12 information and belief will not suffice.  <u>Salma v. Capon</u>, 161 Cal.

13 App. 4th 1275, 1289 (Ct. App. 2008).

14

15 **IV.   <u>DISCUSSION</u>**

16     **A.   <u>Whether Defendants Have Established that Greensprings'
          Suit Arises From an Act in Furtherance of Defendants'</u>**

17     **<u>Right to Petition</u>**

18     Defendants must first establish that the act that is the basis

19 for this malicious prosecution suit, i.e., the act of bringing the

20 <u>Miller</u> suit, was a protected act as defined by sections

21 425.16(b)(1) and (e).  <u>See</u> <u>Kearney</u>, 566 F.3d at 836.  Protected

22 acts are those that "aris[e] from any act of [the defendant] in

23 furtherance of the person's right of petition or free speech under

24 the United States or California Constitution in connection with a

25 public issue."  Cal. Civ. Proc. Code § 425.16(b)(1).  These acts

26 include:

27          (1) any written or oral statement or writing made

28                              12

> before a legislative, executive, or judicial
> proceeding, or any other official proceeding
> authorized by law; (2) any written or oral
> statement or writing made in connection with an
> issue under consideration or review by a
> legislative, executive, or judicial body, or any
> other official proceeding authorized by law . . . .

Id. 425.16(e).

Statements or allegations that are made in a judicial proceeding, as well as "the basic act of filing litigation or otherwise seeking administrative action," are generally covered by the statute. Briggs v. Eden Council for Hope and Opportunity, 19 Cal. 4th 1106, 1115 (1999); see also Chavez v. Mendoza, 94 Cal. App. 4th 1083, 1087 (Ct. App. 2001) ("It is well established that a lawsuit is an exercise of a party's constitutional right of petition. . . . Further, the filing of a judicial complaint satisfies the "in connection with a public issue" component of section 425.16, subdivision (b)(1) because it pertains to an official proceeding." (citations ommitted)). Some courts have stated that a suit for malicious prosecution, which by its nature challenges the act of initiating and participating in an official proceeding, is covered by section 426.16 as a matter of law. See, e.g., Barak v. Quisenberry Law Firm, 135 Cal. App. 4th 654, 661 (Ct. App. 2006).

Greensprings contends that the Miller suit was not a protected act, because the lawsuit was illegal as a matter of law. See Opp'n at 6-11. Greensprings asserts that the November 14, 2004, Letter constitutes extortion as a matter of law, and that the Miller suit was based on an extortionate act and therefore illegal. Id. For support, Greensprings cites Flatley v. Mauro, which denied an anti-

SLAPP motion in a suit alleging civil extortion.  39 Cal. 4th 299.
In <u>Flatley</u>, the underlying act of extortion centered around a
woman's accusations that Flatley had raped her, and the subsequent
letters, phone calls, and cajoling exchanges between her lawyer,
Mauro, and Flatley's representatives.  <u>Id.</u> at 305-11.  Mauro set a
deadline for payment, continuously threatened to go to the media if
he was not paid, and also threatened to go to the media if
Flatley's representatives insisted on investigating the claim.  <u>Id.</u>
The facts were undisputed, and the California Supreme Court
concluded that Mauro's behavior constituted extortion as a matter
of law.  <u>Id.</u> at 328-332.  Because Flatley's suit was based on
Mauro's extortionate and illegal behavior, it was not protected by
section 425.16, and Mauro's special motion to strike was denied.
<u>Id.</u>  The court made it clear that its:

> conclusion that Mauro's communications constituted
> criminal extortion as a matter of law are based on
> the specific and extreme circumstances of this
> case. . . .  Thus, our opinion should not be read
> to imply that rude, aggressive, or even belligerent
> prelitigation negotiations, whether verbal or
> written, that may include threats to file a
> lawsuit, report criminal behavior to authorities or
> publicize allegations of wrongdoing, necessarily
> constitute extortion.

<u>Id.</u> at 332 n.16.

Greensprings also likens this case to that of <u>Cohen v. Brown</u>,
173 Cal. App. 4th 302 (Ct. App. 2009), in which a court denied an
anti-SLAPP special motion to strike a complaint for civil
extortion.  Opp'n at 9-10.  In <u>Cohen</u>, the plaintiff and defendant
were attorneys who had worked together on a case.  173 Cal. App.
4th at 306-11.  The attorneys had a dispute that involved fees, and

14

the defendant attorney had threatened to file a complaint with the California State Bar if the plaintiff attorney did not agree to endorse a settlement check for the case that they had worked on. Id. at 310-11.  The defendant attorney thereafter filed a false complaint with the Bar.  Id. at 311.  The court noted that it is irrelevant whether the party that performed the extortionate act sought to collect money that was justly due.  Id. at 318.

Extortion is defined as "the obtaining of property from another, with his consent . . . induced by a wrongful use of force or fear, or under color of official right."  Cal. Penal Code § 518. "Fear, such as will constitute extortion, may be induced by a threat, either: . . . [t]o accuse the individual threatened . . . of any crime; or . . . [t]o expose, or to impute to him or them any deformity, disgrace or crime . . . ."  Id. § 519.

Greensprings here asserts that the November 14, 2004, Letter was extortionate, citing the following passage:

> [I]f you should decide not to [issue the check to MPA,] you will be forcing us to commence an investigation of your handling of Grandma Teddy's estate if for no other reason than to find out the reason for your peculiar behavior and just what it is that you are trying to hide with respect to Grandma Teddy's along with Grandpa Ward's respective estates.

Opp'n at 9 (quoting November 14, 2004, Letter).  Bohn claims that Dillon was "extremely frightened" by the threat, and for this reason issued the second payment of $500,000, this time to MPA. Bohn Decl. ¶ 11.  Greensprings also cites a statement made by the Attorney Defendants during an oral proceeding in the Miller suit, to the effect that Greensprings received the Millers' silence as

consideration for its promise to pay the $500,000.  Opp'n at 9
(quoting Rice Decl., Ex. I, at 7).

The Court disagrees with Greensprings, and finds that filing
the Miller suit was protected under section 425.16, for two
reasons.  First, the alleged extortion in this case does not rise
to the level of the "specific and extreme circumstances" that were
present in Flatley or Cohen.  Greensprings only cites a single
sentence from a single letter, and this line only threatens to
investigate to determine "what they are trying to hide" by issuing
faulty checks and delaying payment.  Such a statement may be
supportive of an inference of extortion when coupled with other
statements, but standing alone it is not specific or extreme enough
to constitute extortion as a matter of law.  Similarly, the
statements made by the Attorney Defendants, which purport to show
that Greensprings had bought the Millers' silence, only serve to
demonstrate the Millers' desperate attempt to grasp at straws in
order to show some semblance of consideration or reliance in the
Miller suit.  Even together, these facts do not compel the
conclusion that the Millers committed extortion as a matter of law.
Accord Fleming v. Coverstone, No. 08-355, 2009 U.S. Dist. LEXIS
22021, at *11-12 (S.D. Cal. Mar. 18, 2009) (finding threat to
expose illegal tax scheme and unethical conduct unless deposit was
returned to fall short of "extreme circumstances" envisioned by
Flatley).

Even assuming that the November 14, 2004, Letter can be
construed as extortion, this would not establish that the activity
that Greensprings is challenging in its complaint is not an

16

activity protected by section 425.16.  Greensprings is not bringing

a suit for civil extortion, but a suit for malicious prosecution.

The challenged activity is therefore not the November 14, 2004,

Letter, but the Miller suit that came several years after the

letter.  Although Greensprings is alleging that Miller suit "was

based on" the November 14, 2004, Letter, this is not clearly so.

As described above, the Millers had alleged promises that Dillon

had made before the letter, and promises that Briggs made well

after the letter.  There were numerous exchanges of checks that

came both before and after the letter.  As a result, even if

Greensprings can succeed in painting the November 14, 2004, Letter

as extortionate, the Miller suit was clearly based on more than

simply the letter.  As such, filing and maintaining the suit was a

protected act, even though Greensprings can identify a related,

non-protected act.  See Gallanis-Politis v. Medina, 152 Cal. App.

4th 600, 613 (Ct. App. 2007) (collecting cases supportive of

conclusion that, "where a cause of action alleges both protected

and unprotected activity, the cause of action will be subject to

Code of Civil Procedure section 425.16 'unless the protected

conduct is 'merely incidental' to the unprotected conduct'"

(quotations omitted)).

     Similarly, Greensprings argues that, by referring to the

$200,000 pledge made in the name of the Miller Family Foundation,

the Millers illegally attempted to assert the rights of a suspended

corporation in violation of section 19719 of the California Revenue

and Taxation Code.  Opp'n at 10.  The Miller's raised this argument

in their amended complaint, and they raised it peripherally and in

the alternative.  This appears to have been another unsuccessful

attempt by the Millers to establish reliance.  The Court finds that

the Millers' argument does not remove the entire suit from the

protection of section 425.16.  Defendants have met their burden

with respect to the first prong of the anti-SLAPP inquiry.

      **B.**     <u>**Whether Greensprings Has Demonstrated a Probability of**</u>
      <u>**Prevailing on the Merits**</u>

      The burden now shifts to Greensprings, to allege and

substantiate a valid claim for malicious prosecution.  <u>See</u> <u>Vargas</u>,

46 Cal. 4th at 19-20.  To prevail in its malicious prosecution

claim, Greensprings must show that the prior action:  "(1) was

commenced by or at the direction of the defendant and was pursued

to a legal termination favorable to the plaintiff; (2) was brought

without probable cause; and (3) was initiated with malice."

<u>Soukup</u>, 39 Cal. 4th at 292.  The first element is uncontested.  <u>See</u>

Miller Mot. at 11.  Greensprings must therefore make a minimal

showing, substantiated by evidence, that the prior suit lacked

probable cause and was initiated with malice.  <u>See</u> <u>Soukup</u> at 291-

92.

      **1.**    **Whether the Miller Suit Lacked Probable Cause**

      "The question of probable cause is 'whether, as an objective

matter, the prior action was legally tenable or not.'"  <u>Id.</u>

(quoting <u>Sheldon Appel Co. v. Albert & Oliker</u>, 47 Cal.3d 863, 868

(1989)). There are two ways of establishing that a suit was brought

without probable cause, based on either factual deficiencies or

legal deficiencies:  "A litigant will lack probable cause for his

action either if he relies upon facts which he has no reasonable

cause to believe to be true, or if he seeks recovery upon a legal theory which is untenable under the facts known to him." Sangster v. Paetkau 68 Cal. App. 4th 151, 164-65 (Ct. App. 1998). Probable cause must exist for every cause of action in the underlying action; if just one of the theories asserted lacks probable cause, then this part of the plaintiff's burden is met. See Soukup, 39 Cal. 4th at 292.

Greensprings offers three types of argument to suggest that the Millers lacked probable cause to bring the Miller suit. First, Greensprings claims that the suit lacked probable cause because the facts asserted in the suit were false, and the Defendants knew of their falsity. FAC ¶ 20. However, Greensprings never identifies which claims were false. Greensprings does not deny that there was a promise to make a $500,000 donation. At most, the evidence submitted by Greensprings insinuates that the Millers mischaracterized the promise, and the alleged mischaracterizations are relatively trivial.[8] See Bohn Decl. ¶¶ 6, 10. This does not

_____

[8] The Millers claim that the promise to make the donations was 1) in lieu of the gift of a house and 2) in the names of Molly and Anne. See Barbara Aff. ¶¶ 6-7. Bohn contests both aspects in his declaration. See Bohn Decl. ¶¶ 6, 10. Dillon did not submit any declaration demonstrating her understanding of her own promise, and without establishing a foundation as to how Bohn came to know of the alleged promises first hand, his declaration does not constitute admissible evidence that the Millers' claims were false or known to the Millers to be false. No other evidence undermines the Millers' claim that the promise to pay $500,000 was in lieu of the house, and no other explanation has been posed -- indeed, the court finds it the only reasonable explanation posed by either party for the first payment of $500,000. Greensprings does provide two 2002 e-mails from Barbara, in which she also described the donation as in honor of Turchen, rather than Anne and Molly. See Bohn Decl. Exs. A, B. Even assuming that Greensprings has proven that this is a mischaracterization, it would add no strength to the Millers' claims, would be irrelevant to the underlying litigation,

amount to a showing that the Millers brought the underlying suit based on claims that they had no reason to believe to be true. Greensprings must therefore establish that the Miller suit lacked probable cause because of the deficiencies of its underlying legal theories.

Greensprings also offers a kind of formal argument to establish that the Miller suit lacked probable cause:  that the dismissal of the Miller suit was "a finding that the Millers and their attorneys did not have probable cause to bring the prior action . . . and has res judicata effect in later actions." Opp'n at 13.  This argument is patently false.  A dismissal for failure to state a claim is not a finding that the suit lacks probable cause.  A suit lacks probable cause only if no "reasonable attorney would have thought the claim tenable." See Sheldon Appel, 47 Cal. 3d at 886; see also Roberts v. Sentry Life Ins., 76 Cal. App. 4th 375, 382 (1999) ("Probable cause may be present even where a suit lacks merit.").  Not every claim that gets dismissed is objectively unreasonable.  The fact that the Miller complaints were dismissed may be necessary for the conclusion that the suit lacked probable cause -- however it does not end the inquiry.  Similarly, the Court is not persuaded by the Millers' argument that, just because the Millers were granted leave to amend their complaint after it was first dismissed, the previous court must have ipso facto recognized some merit in Millers' claims.  See Miller Mot. at 14; see also Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when

---

and does not even paint Greensprings or its associates in a negative light.

justice requires.").  Such an inference would be especially

inappropriate where the previous court, in granting leave to amend,

listed a slew of factual deficiencies that needed to be developed

before a claim could be stated.  <u>See</u> First Dismissal Order at 5.

Finally, Greensprings argues that "the deficiency lies in an

untenable legal theory or theories under the facts pleaded."  Opp'n

at 12.  Having reviewed the claims asserted by the Millers in the

<u>Miller</u> suit, the Court agrees with Greensprings that at least some

of these claims lacked probable cause because the legal theory

asserted was wholly inapplicable.  The Millers brought their

breach-of-contract claim without a colorable showing of either

damages, consideration, or reliance.  The Millers claimed

forbearance in asserting claims against the Turchen estate, but

this Court has searched the pleadings in both suits in vain for an

explanation of a theory or valid claim that the Millers or Molly

could have asserted against the estate, and agrees that the

Millers' "forbearance was worthless, since they had no viable claim

against [Turchen's] estate."  Second Dismissal Order at 10-11, 18;

<u>see also</u> Miller Docket No. 84 ("Miller Opposition to MTD") at 9-10.

The Millers attempted to use the Miller Family Foundation's pledge

of $200,000 to establish reliance by the Millers, and to state an

alternate claim for $200,000, but this was not supported by the

facts.  As the Second Dismissal Order noted, not only was the

Miller Family Foundation suspended, but the pledge could not have

reasonably served as a basis for liability against the Millers.

<u>See</u> Second Dismissal Order at 7-8.  In addition to the breach-of-

contract claim, the Millers' claims for interference with the right

21

to inherit were both legally novel and unsupported by any explanation as to how they acquired a colorable claim to inherit. See Miller Opp'n to MTD at 19.  Neither the Millers nor the Attorney Defendants attempt to explain how any of these claims were objectively reasonable in their Motions or Replies, or in papers filed in the underlying suit.  This Court finds that these claims not only lacked merit; they objectively lacked probable cause.

### 2.   Whether Greensprings Established Malice

Greensprings must next establish by proof that the Millers and the Attorney Defendants were actually malicious in filing and prosecuting the Miller suit.  While probable cause is an objective standard, malice "relates to the subjective intent or purpose with which the defendant acted in initiating the prior action . . . ." Sheldon Appel, 47 Cal. 3d at 874.  Although malice is typically an issue of fact to be determined by a jury, id., Greensprings must at least make a minimal showing of malice to establish a probability of success and survive the anti-SLAPP motion, see Soukup, 39 Cal. 4th at 291.  The Court finds that Greensprings has failed to make this showing.

"Malice cannot be established simply by a showing of the absence of probable cause, although the fact that the prior suit was objectively untenable is a factor that may be considered on the issue of malice." Id.  Additional evidence "must include proof of either actual hostility or ill will on the part of the defendant or a subjective intent to deliberately misuse the legal system for personal gain or satisfaction at the expense of the wrongfully sued defendant." Downey Venture v. LMI Ins. Co., 66 Cal. App. 4th 478,

498 (Ct. App. 1998); <u>see also</u> <u>Estate of Tucker v. Interscope</u>
<u>Records</u>, 515 F.3d 1019, 1031 (9th Cir. 2008) (quoting <u>Downey</u>
<u>Venture</u>).  "Evidence of malice is typically drawn from inferences
and circumstantial evidence." <u>Paulus v. Bob Lynch Ford, Inc.</u>, 139
Cal. App. 4th 659, 675 (Ct. App. 2006).  California courts have
identified a number of instances that demonstrate malice:

> [T]he principal situations in which the civil
> proceedings are initiated for an improper purpose
> are those in which (1) the person initiating them
> does not believe that his claim may be held valid;
> (2) the proceedings are begun primarily because of
> hostility or ill will; (3) the proceedings are
> initiated solely for the purpose of depriving the
> person against whom they are initiated of a
> beneficial use of his property; (4) the proceedings
> are initiated for the purpose of forcing a
> settlement which has no relation to the merits of
> the claim.

<u>Albertson v. Raboff</u>, 46 Cal. 2d 375, 383 (1953); <u>Paulus</u>, 139 Cal.
App. 4th at 675 n.12 (listing same instances demonstrating malice).

Greensprings' FAC and Opposition do not make a minimal showing
of malice.  The FAC includes a number of unsupported claims with
respect to the intent of the Millers and their attorneys.  FAC ¶¶
22, 24.  Such averments do not amount to "proof" sufficient to
establish likelihood of success for the purpose of surviving a
special motion to strike.  <u>See</u> <u>Salma</u>, 161 Cal. App. 4th at 1289.
The single piece of evidence that Greensprings cites is the
November 14, 2004, Letter, which it claims demonstrates malice and
"actual hostility."  FAC ¶ 23; Opp'n at 22.  While the letter is no
paragon of courtesy, the Court does not find that it demonstrates
more hostility than does typical pre-litigation posturing.  Nor
does this letter demonstrate that the Millers brought the suit for

an improper purpose, or believed their claims invalid.  Rather, the letter strongly suggests that the Millers brought suit for the purpose that they have always stated:  to induce Greensprings to follow through on its alleged promise to provide a $500,000 donation.

As previously discussed, Greensprings argues that the Millers made certain "false claims," FAC ¶¶ 22, 24, but in its Opposition, Greensprings fails to identify any false claims and does not substantiate this assertion.  The best that Greensprings can establish by admissible evidence is that the Millers recharacterized the promised donation, by stating that it was "in honor of Ikie [Ward] and Grandma Teddy" in 2002, Bohn Decl. Ex. B, and then by later claiming that the donation was to be in the names of Molly and Anne, see Barbara Aff. ¶ 7.  The Court finds that these claims are not wholly inconsistent, that they raise at most a trivial issue, and that they are barely relevant to the litigation. This is legally insufficient to establish a minimal showing of malice.  At best, this establishes that the parties had a different understanding of a detail to their agreement, and Greensprings does not assert that the agreement itself was fabricated.  C.f. Swat-Fame, Inc. v. Goldstein, 101 Cal. App. 4th 613, 634 (Ct. App. 2002) (overruled on other grounds by Zamos v. Stroud, 32 Cal. 4th 958 (2004)) (finding possibility of malice where complainant admitted to making false statements in complaints).

Greensprings also argues that the overall weakness of the arguments that the Millers made in the Miller suit demonstrates the improper purpose of "forcing a settlement that has no relation to

24

the merits of the claims." Opp'n at 22-23.  It cites a number of
the unfounded arguments raised by the Millers' attorneys, which the
Court addressed in Part IV.B.1, supra.  Id.  Although these
arguments were objectively poor and therefore made without probable
cause, there is no indication that they were made in bad faith, and
the fact that they lacked probable cause is itself legally
insufficient to establish malice.  See Downey Venture, 66 Cal. App.
4th at 498 (" Merely because the prior action lacked legal
tenability, as measured objectively (i.e., by the standard of
whether any reasonable attorney would have thought the claim
tenable), without more, would not logically or reasonably permit
the inference that such lack of probable cause was accompanied by
the actor's subjective malicious state of mind." (citations
omitted)).  Greensprings offers no evidence that the Millers
attempted to procure an unwarranted settlement (or any settlement),
thus it is not clear how the suit could be construed as an attempt
to force "a settlement that has no relation to the merits of the
claims."  Rather, the Millers' efforts demonstrate an intent to
succeed or reach a settlement with respect to the promised donation
that was at the very heart of their suit, however futile their
arguments to this end might have ultimately been.  C.f., HMS
Capital, Inc. v. Lawyers Title Co., 118 Cal. App. 4th 204, 218-19
(Ct. App. 2004) (citing questionable settlement tactics and lack of
progress in prosecution to establish malice).

Greensprings' final argument is that the Millers were
malicious because they attempted "to force Greensprings to do an
*ultra vires*."  Opp'n at 23.  The Court will not infer, without any

25

evidence, that the Millers foresaw the tax consequences that their success may have upon Greensprings, nor that the Millers filed or maintained this suit for the improper purpose of achieving this result.

Greensprings has shown that the Millers were frustrated.  It has shown that there was some nitpicking over the peripheral terms of an undisputed promise.  It has convinced the Court that the claims in the ensuing lawsuit were without an objectively reasonable legal basis.  However, without more, Greensprings cannot make a minimal showing of malice.

**V.**     **CONCLUSION**

Defendants' Motions to Strike are hereby GRANTED, and Greensprings' FAC is DISMISSED.  However, in light of the policy favoring liberal amendment of claims embodied by Rule 15(a) of the Federal Rules of Civil Procedure, Greensprings is granted leave to amend its complaint if it believes that it can make a successful showing of malice.  If Greensprings chooses to amend its complaint, it must do so within thirty (30) days of the date of this order.

IT IS SO ORDERED.

July 28, 2009

_____

UNITED STATES DISTRICT JUDGE

26